707 F.Supp. 1034 (1989)
LAC COURTE OREILLES BAND OF LAKE SUPERIOR CHIPPEWA INDIANS; Red Cliff Band of Lake Superior Chippewa Indians; Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin; St. Croix Chippewa Indians of Wisconsin; Bad River Band of the Lake Superior Chippewa Indians; Lac Du Flambeau Band of Lake Superior Chippewa Indians, Plaintiffs,
v.
STATE OF WISCONSIN, Wisconsin Natural Resource Board, Carroll D. Besadny, James Huntoon, and George Meyer, Defendants.
No. 74-C-313-C.
United States District Court, W.D. Wisconsin.
March 3, 1989.
As Amended April 28, 1989.
*1035 *1036 Tracey Schwalbe, Hayward, Wis., James L. Beck, Wisconsin Judicare Inc., Wausau, Wis., for Lac Courte Oreilles Band of Lake Superior Chippewa Indians.
Milton Rosenberg, Madison, Wis., for Red Cliff Band of Lake Superior Chippewa Indians.
Deborah Krusche Bruck, Milwaukee, Wis., for Sokaogon Chippewa Indian Community, Mole Lake Band of Wisconsin.
Howard Bichler, Webster, Wis., for St. Croix Chippewa Indians of Wisconsin.
Candy L. Jackson, Odanah, Wis., for Bad River Band of the Lake Superior Chippewa Indians.
Kathryn Tierney, James Janetta, Lac du Flambeau, Wis., for Lac du Flambeau Band of Lake Superior Chippewa Indians.
Mary Bowman, Stephen J. Nicks, Asst. Atty. Gen., Madison, Wis., for defendants State of Wis., Wisconsin Natural Resources Bd., Carroll D. Besadny, James Huntoon, and George Meyer.

OPINION AND ORDER
CRABB, Chief Judge.
This is a civil action in which plaintiffs seek definition of their treaty-based, off-reservation usufructuary rights to hunt, fish, and gather, and to enjoin defendants from interfering with the exercise of those rights. The plaintiffs are political successors in interest to the bands of the Lake Superior Chippewa who were parties to the treaties of 1837 and 1842. They are recognized by the Secretary of the Interior, and each has a government organized pursuant to the provisions of the Indian Reorganization Act, 25 U.S.C. secs. 461 et seq. Defendants are the State of Wisconsin; the Board of the Wisconsin Department of Natural Resources; Carroll Besadny, Secretary of the Department of Natural Resources; *1037 and James Huntoon and George Meyer, administrators in the Department of Natural Resources. All of the defendants are engaged in the promulgation and enforcement of the open water fishing laws and regulations of the State of Wisconsin.
In prior proceedings, the Court of Appeals for the Seventh Circuit held that plaintiffs retained their off-reservation usufructuary rights to hunt, fish, and gather within the "ceded territory" (that portion of northern Wisconsin ceded by plaintiffs to the United States in treaties executed in 1837 and 1842), and this court has determined the nature and scope of those rights and the basis for state regulation of the rights. The prior determinations by this court made up Phase I, or the declaratory phase, of the case. The present proceedings are part of Phase II, the regulatory phase. To set the stage for what follows, I will reiterate certain relevant principles governing this case that have been established in previous decisions of this court and of the Court of Appeals for the Seventh Circuit.
Plaintiffs hold usufructuary rights on the lands they ceded to the United States. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341 (7th Cir.) (LCO I) cert. denied, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). These rights include the rights to hunt, fish, and gather all the forms of animal life and vegetation identified in Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 653 F.Supp. 1420, 1426-1428 (W.D.Wis.1987) (LCO III), using all of the methods of harvesting employed in treaty times and developed since then. Id. at 1435. Plaintiffs may trade and sell to non-Indians the fruits of the exercise of their usufructuary rights. Id. Plaintiffs may exercise their usufructuary rights throughout the ceded territory, except on those portions that are privately owned as of the times of the contemplated or actual attempted exercise of the rights. LCO I, 700 F.2d at 365 n. 14; LCO III, 653 F.Supp. at 1435. Plaintiffs enjoy greater rights to hunt, fish, and gather within the ceded territory than do non-Indians; plaintiffs' rights are paramount. LCO III at 1429. Plaintiffs' rights are not exclusive; they hold them in common with non-Indians, United States v. Bouchard, 464 F.Supp. 1316, 1338 (W.D.Wis.1978), rev'd on other grounds sub. nom. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341. It was plaintiffs' understanding at the time of the 1837 and 1842 treaties that
In the absence of a lawful removal order or in the absence of fresh agreement on the part of the Chippewa, the presence of non-Indian settlers would not require the Chippewa to forego in any degree that level of hunting, fishing, and gathering, and that level of trading necessary to provide them a moderate living off the land and from the waters in and abutting the ceded territory and throughout that territory.
LCO III, 653 F.Supp. at 1432.
Plaintiffs have the right to harvest within the ceded territory so much of the natural resources as is necessary to provide them with a modest standard of living. Id. at 1434-1435. Plaintiffs' modest living needs could not be met from the presently available harvest within the ceded territory even if plaintiffs were physically capable of gathering, processing, and disposing of that harvest. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 686 F.Supp. 226 (W.D. Wis.1988) (LCO V).
The State of Wisconsin may regulate the exercise of the plaintiff tribes' usufructuary rights only in the interest of conservation and public health and safety and only upon a showing that the regulation is reasonable and necessary for either conservation or health and safety and that it does not discriminate against the Indian harvest. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. State of Wisconsin, 668 F.Supp. 1233 (W.D.Wis.1987) (LCO IV).
The issue now before the court is the extent, if any, to which the State of Wisconsin may regulate plaintiffs' exercise of their usufructuary right to harvest walleye and muskellunge within the ceded territory. *1038 For the reasons that follow, I conclude that defendants have failed to show that plaintiffs are incapable of regulating their members' off-reservation walleye and muskellunge harvest, but that defendants have shown that plaintiffs can conduct that harvest without harm to the walleye and muskellunge only if plaintiffs enact and implement certain conservation-based measures and procedures as set forth in this opinion. If plaintiffs do this, then defendants cannot regulate tribal members' rights and activities in harvesting walleye and muskellunge within the ceded territory, except to the extent agreed to by the parties in their pretrial stipulations. However, if any tribe fails to enact a regulatory plan that conforms to this opinion, or withdraws from the regulatory plan after it is enacted, or if any tribe proves unable to enforce general compliance with the plan by its members, or if tribal regulation of off-reservation harvesting of walleye and muskellunge proves ineffective for any other reason, state regulation of that tribe in accordance with the standards set forth in this opinion will be sanctioned. I conclude also that defendants have not yet shown a basis for a general allocation of the muskellunge and walleye resource (or of any other resource) between the plaintiffs and the non-Indian users of the resources, and I will reserve a resolution of that issue until further development of the record by the parties.
Both sides have filed proposed regulations that would govern plaintiffs' harvest of walleye and muskellunge. Defendants' version is in the form of an emergency rule, NR 13, and plaintiffs' is denominated Off-Reservation Code. Through negotiation the parties have reduced substantially the number of regulatory provisions in dispute. For example, the parties have agreed on the type of documentation required for commercial sales and on the requirement of permits for particular fishing activities. They have agreed that the plaintiff tribes have the capacity to enforce effectively tribal regulations contained in the Off-Reservation Code using tribal enforcement personnel and tribal courts, and that Wisconsin conservation wardens may issue citations to tribal members for violation of regulations conforming to this court's order. The parties have reached agreement in other areas including food processing, gear marking and identification requirements, and certain biological and other issues.
Left for trial is the question of the role to be played by either side in the management of the walleye and muskellunge resources, and a dispute over the following specific regulatory issues: 1) the lakes in which the tribes will be allowed to fish by spearing, fyke and dip netting, seining, and gillnetting; 2) the method of establishing spearing and netting harvest limits on muskellunge; 3) the biological information about any lake required in order to open it to tribal spearing and netting; and 4) the number of walleye and muskellunge that may be harvested by spear or net from any lake.
Under defendants' plan, NR 13, spearing and netting other than gillnetting would be permitted only on lakes over 500 acres; under plaintiffs' plan, the Off-Reservation Code, spearing and netting would be allowed on lakes of any size, subject to certain conditions. Defendants would prohibit gillnetting on lakes under 1000 acres; plaintiffs would permit gillnetting on lakes of any size. Defendants would require a quota of muskellunge by spear and net on each lake, with permits issued for each tribal harvester; plaintiffs would establish an individual bag limit of two muskellunge a day, with tribal harvest prohibited when the total harvest on any one lake is 50 percent of the safe harvest. Defendants would require a mark-and-recapture population estimate no more than two years old before opening any lake to spearing or netting, and would limit spear or netting harvest totals to a percentage of the estimated number of fish available for harvest; plaintiffs would permit spearing and netting on a lake for which a population estimate has been made by one of a number of methods, including mark-and-recapture, and would limit harvest totals based on the reliability of the estimate used.
*1039 Defendants contend that their proposed regulation, NR 13, is a necessary and reasonable conservation measure; that it restricts the tribal harvest no more than is necessary to preserve the resource; and that it does not discriminate against the tribal harvest. Plaintiffs disagree. They maintain that defendants have failed to show the necessity for their management plan, and they contend that the plan's primary thrust is to preserve a non-Indian harvest, rather than the conservation of the species, and that it does discriminate against the tribal harvest.
As a basis for resolving these issues, I make the following findings of fact from the evidence adduced at the fourteen-day trial of this part of Phase II. I note, with appreciation for their efforts, that the parties' comprehensive and focused proposed findings of fact have made this task much easier.

FACTS

I. NATURE OF THE WALLEYE AND MUSKELLUNGE RESOURCE IN THE CEDED TERRITORY

A. Walleye

The walleye (stizostedion viteum) is the largest North American member of the percidae family. (It is not a pike, although it is often referred to as one.) It is characterized by spiny dorsal and anal fins and large eyes with no iris to shut out light. It lives as long as 20 years and when fully grown, may be as long as 32 inches and weigh up to 15 pounds. (Male walleye tend to be smaller than females.) It is crepuscular in nature, that is, it is particularly active at dawn and dusk.
The walleye is a predator that maintains stability in lake communities. It is sometimes referred to as the "keystone" in the ecology of a lake, for the role it plays in improving the lake's panfish population and water quality.
Walleye begin spawning at ages three to six and continue throughout their lives. Ordinarily, the male walleye matures and starts spawning in the third year; the female, in the fourth or fifth years. Because the walleye is a multiple spawning animal (returning to spawn year after year), the production of a particular year class of walleye is not dependent upon a single year class of spawners. (A "year class" is that group of fish hatched in a given year; a "population" is made up of several year classes). Walleye reproductive success is influenced by many factors, one of which is the number of adult spawners.
In Wisconsin, male walleye move into the spawning areas in April and May, when the water temperature reaches approximately 47 degrees. They are followed by the females, which deposit their eggs while the males swim alongside and deposit their milt to cover the eggs. Lake spawning walleye congregate at night to spawn over rock or gravel substrata along the shore, in water less than three feet deep. Some lake populations of walleye migrate up tributaries to spawn on rock or gravel bottoms or marsh areas. Walleye tend to return to the same spawning areas each year.
Spawning lasts between one to two weeks, although individual females deposit most of their eggs in one night. Various physical factors on individual lakes affect walleye spawning, but as a general rule, spawning starts earlier in the western part of the ceded territory, and moves eastward, so that all the spawning does not occur on all lakes in the ceded territory at the same time.
Fertilized walleye eggs incubate for about one month, depending on the temperature. Usually, fewer than 1% of the eggs survive to adulthood. The walleye that hatch each spring (called the "young-of-the-year") are highly vulnerable to predation and other natural mortality. There is often little correlation between the number of young-of-the-year that are hatched and the number that survive to become "age one walleye." In some cases the entire year class may fail to survive.
Annual natural mortality of a walleye population may range from 5% to 50%, and may be caused by predation, parasitism, or other diseases. Even in unfished lakes, walleye stock may vary dramatically from *1040 year to year as a result of climatic influences, episodic events, floods and other natural events.
Biologists do not know whether current or future walleye spawning is affected adversely by spearers' disturbance of the spawning areas or their use of bright lights to help locate the target fish.

B. Muskellunge

The muskellunge (esox masquinongy) is the largest member of the pike family. It is a long, slender fish, 28 to 34 inches at adulthood, characterized by a stripe like a lightning flash down its back, and very large jaw teeth. It is a solitary, sedentary, predatory fish that aggregates only during the spawning season. It inhabits lakes with broadleaf pond weed, arrow leaf, pickerelweed and water lilies, and among yellow perch, brown bullheads, white suckers and sunfish. It is a long-lived fish (20 years or more).
The male muskellunge matures sexually at four to seven years, the female, at four to six years, depending on location, latitude, and size of the body of water. Muskellunge spawn in the spring in either river systems or marshy areas on vegetation mats in water approximately three feet deep. They usually congregate to spawn about one to two weeks after the walleye spawning season, returning to specific spawning locations. (Generally muskellunge and walleye do not use the same spawning ground.) A large female muskellunge may deposit as many as 300,000 eggs in a season, of which approximately two will survive to adulthood.

C. Walleye lakes

Within the ceded territory, there are 2,359 lakes greater than 25 acres. (Throughout this opinion I will use "lakes" to refer to any body of water from which walleye or muskellunge can be harvested.) The total area of these lakes is 483,926 acres. Of the known lakes, approximately 861 contain walleye. These tend to be the larger lakes, covering 66 percent of the total lake surface area in the ceded territory, or 350,129 acres. The Department of Natural Resources estimates that there are approximately 408,000 walleye distributed in lakes smaller than 500 acres and approximately 1.2 million in lakes greater than 500 acres. Approximately 40% of the lakes are stocked to supplement natural reproduction; only 6 or 7 percent of all walleye lakes are dependent completely upon stocking for reproduction.
There is a loose relationship between the size of a given lake and the size of the walleye population, but populations are highly variable among lakes and even within the same lake. Walleye abundance varies considerably not only from lake to lake, but over time within the same lake. The abundance of adult walleye (walleye age 3 and over) may vary from .2 to 30 per acre in lakes ranging in size from 42 to 15,000 acres. In Escanaba Lake, which is a 300-acre lake used by the Department of Natural Resources for research, the number of adult walleye has varied from 5.2 to 29.4 per acre over a 29 year period. Adult walleye abundance varies as a consequence of reproduction, harvest, natural mortality and environmental factors.
In any given lake, there may be more than one stock of walleye present. (A stock is a separate group of walleye that regularly interbreed.)

D. Muskellunge Lakes

In the ceded territory there are approximately 42,564 muskellunge distributed in lakes smaller than 500 acres, and approximately 46,848 muskellunge in lakes larger than 500 acres. Adult muskellunge populations range from .02 to 2.94 fish per acre. The average adult abundance of muskellunge is about one fish per acre.
Shoreline development along the lakes has damaged muskellunge spawning habitat over the last hundred years.

II. FISHING METHODS

A. Methods at Issue

Since the last century, and prior to the judicial recognition of plaintiffs' usufructuary rights, the state prohibited the catching of walleye and muskellunge from off-reservation inland waters by any method other than angling. It has prohibited the use of gill nets on inland lakes since 1878, with *1041 the exception of a few, very large lakes, where it has permitted netting for buffalo and carp. These prohibitions no longer apply to plaintiffs when they are exercising their usufructuary rights within the ceded territory. Plaintiffs have been engaged in spearing walleye and muskellunge in the last few years, and they have advised defendants they intend to engage in netting fish, with both "live trap nets" (fyke and dip nets) and "dead trap nets," such as gill nets.

B. Classification of Fishing Methods

Fisheries biologists from the Department of Natural Resources and the Great Lakes Indian Fish and Wildlife Commission (GLIFWC) have classified fishing gear in terms of efficiency and selectivity and the level of effort with which they are utilized, and have developed minimum requirements for harvest monitoring, population monitoring, and regulations. In chart form, their classification is as follows:

 EFFICIENCY
-------------------------------------------------------------------------------
 EFFORT : Low High
-------------------------------------------------------------------------------
 Low : Low probability Low probability
 : long-term risk short-term risk
 :
 Gear types : Unattended lines Gillnets
 : Set lines/bank poles Fyke nets
 : Ice spearing (walleye) Spring seining
 : Summer/fall spearing Weir
 :
 Harvest : Periodic Short term
 Monitoring : Voluntary reporting Total counts
 : Mail surveys Registration
 : Mandatory reporting
 :
 Regulations : Permits Permits
 : Effort restrictions
 : Size restrictions
 :
 Population : Per generation Per generation
 monitoring : Relative abundance Relative abundance
 : Length distribution Age and growth
 :
-------------------------------------------------------------------------------
 High : High probability High probability
 : long-term risk short-term risk
 :
 Gear types : Hook and line Spring spearing
 :
 Harvest : Annual Daily
 monitoring : Statistical surveys On-site
 : Mandatory reporting Total counts
 : Registration
 :
 Regulations : Permits Quota
 : Efficiency Short-term permits
 : restrictions

*1042
-------------------------------------------------------------------------------
 : Size limits Size limits
 :
 Population : Per generation Undecided frequency
 monitoring : Relative abundance Absolute abundance
 : Age and growth Age and growth
-------------------------------------------------------------------------------

1. Angling

As the chart shows, angling is an inefficient, high effort method of harvesting fish. Because of its inefficient nature it is largely, but not completely, self-regulating: as fish populations decrease, it becomes harder to catch a fish, and anglers move on to other waters.
The catch rate for angling depends on such factors as stock density, availability of other food, and angler skill. Fisheries managers can spread the fish-catching opportunity among more participants by restricting the number of fish caught, the minimum size of the fish caught, and the gear used.

2. Spearing

On lakes within the reservations occupied by plaintiffs and recently on certain lakes within the ceded territory, members of the plaintiff tribes have engaged in spring spearing. Spearing is usually done from a boat containing two people, one rowing or guiding the boat and one standing to spear, wielding a fish spear that is 10 to 14 feet long. The spearer uses a light that is either mounted on his headgear or on his boat.
Spearing is classified as a high efficiency, high effort method of fishing that tends to select for the larger, mature fish that are on the spring spawning reefs. Harvesting a walleye by spearing takes an average time of five minutes; harvesting a walleye by an angler targeting for walleye takes an average of 9.65 hours.
The time of spawning, mercury advisories, water clarity, water surface disturbances and threats of violence by groups opposed to spearing affect plaintiffs' selection of lakes for spearing and netting.

3. Gillnetting

Gillnetting is classified as high efficiency, low effort fishing. Gillnets are set and lifted about once every 24 hours; they require little or no attention between the time they are set and the time they are lifted. The nets are a form of entanglement gear that captures fish as they swim into the net and become entangled. Gillnets are particularly effective for catching walleye and muskellunge because of the fishes' sharp teeth, and the walleye's spiny rays, which catch on the nets. In addition, the bottom feeding habits of walleyes and their difficulty in seeing and avoiding the nets during their early morning, late evening feeding make them particularly susceptible to bottom set nets. Also, at certain times of the year, walleye exhibit twilight movements just off shore that enable fishers to set nets to intercept the fish.
Muskies often get caught in a gillnet because they attempt to feed on a smaller fish that has been caught in the net and, in the process, bite into the net or otherwise get entangled in it.
A gillnet is considered a "dead trap net," because most of the fish caught in the net will be dead when the net is lifted even if it is lifted daily. The fish die from getting caught with their gills closed, from stress, which builds up lactic acid in their muscles as they struggle to free themselves from the net, or from being eaten by predators such as turtles or larger fish. Even those fish that are alive when the net is lifted may die shortly thereafter from loss of scales and the protective mucous coating on the scales which leaves them vulnerable to bacterial infection, particularly in warm water.
The number and kind of fish caught in a gillnet can be regulated to some extent by controlling the length of the net and the *1043 size of the openings. However, the use of gillnets results frequently in the incidental catch of species other than the targeted ones.
Little is known about intensive gillnetting on small lakes. Tribal and state biologists conducted a study of the effects of gillnetting on Escanaba Lake in 1984. From their assessment studies, they derived statistics that they attempted to translate into a curve that would show how vulnerable particular-sized fish are to the mesh being fished. The studies also provided information of the variability surrounding gillnet catches. This information indicated that the bulk of the catches are between zero and ten fish per hundred feet of net, but that there are occasional catches of as many as 45 fish per hundred feet. Although the frequency of such an unusually large catch is less than half a percent, the fact that it occurs indicates both that biologists need more information on the effects of gillnet harvests and that this fishing method poses a significant risk of overfishing. The risk is increased by the fact that the catch cannot be known before the net is lifted, when most of the fish are dead or injured and cannot be returned to the water.
Unlike angling, in which population and catch tend to decrease simultaneously, in gillnetting, the catch rate may stay up while the population is decreasing dramatically. This phenomenon has been observed in the perch population in Green Bay.

4. Fyke nets, weir nets, and seining

Fyke nets, weir nets, and seining are classified as high efficiency, low effort fishing gear. They are trap nets, and most of the fish caught in them will be alive and uninjured when the nets are lifted. In further discussion of these methods, I will use the term live nets to include fyke and dip nets and seining.

5. Other fishing methods

Tribal members participate in other fishing efforts, such as ice fishing with lines, open water hook and line fishing, unattended lines, set lines, bank poles, ice spearing of walleye, and summer and fall spearing. These efforts are classified as low effort, low efficiency fishing methods. By stipulation, the parties have agreed that tribal members using these methods will not be subject to any bag limits, size restrictions, or seasons. However, defendants have proposed subjecting all spearing to minimum sized lakes for which population estimates have been made, whether the spearing is conducted during the spring spawning season or at other times.

III. DETERMINING FISH POPULATIONS AND FISH HARVESTS

A. Population Estimation

It is inaccurate to speak of "measuring" the actual population of any given body of water, because live fish cannot be seen to be counted. Fish biologists can only estimate the biological statistics of a population, that is, the size of the population, the rate of growth, rate of mortality, and exploitation rate, using different mathematical models. These population estimates can then be evaluated on the bases of their precision, their accuracy, and their bias. (Precision is a measure of the variance of the estimate; accuracy is a measure of the likelihood that the estimate approximates the actual population; and bias is a measure of the likelihood that the estimate tends to overestimate or underestimate the population.)

1. Direct methods of estimating population

a. Mark-and-recapture
The most accurate fish population estimation method now known is based on a "mark-and-recapture" survey. In this kind of survey, two separate "catches" are made of the fish in the lake. After the first catch, the fish are marked, and in the second catch, the number of marked fish is compared to the number of unmarked fish. The catches are made usually with a fyke net during spawning season when the fish are congregated in shallow water; the marking is done by snipping a fin or inserting *1044 a tag into the fish's mouth. Each catch proceeds under a set of assumptions that exist in the statistical framework determining the study. The ratio of marked and unmarked fish in the second catch is analyzed according to a standardized formula, and the outcome is used to estimate the abundance of each species and age group within the lake. (The mark-and-recapture survey is not as accurate for muskellunge as it is for walleye, because the lower relative density of muskellunge produces much smaller survey samples.)
The mark-and-recapture survey is subject to a certain level of sampling error. The survey result is an estimate that should be within a certain range of the true population if the survey has been performed correctly. The accuracy of this population estimate declines quickly as time passes. With respect to walleye, for example, the population measured in one year will be almost completely replaced by a different population in two to three years.
The cost of doing one mark-and-recapture survey on one lake is about $15,000. The Department of Natural Resources spends approximately $320,000 a year for assessment programs of this kind. GLIFWC has a considerably smaller budget for its assessment programs. It has conducted mark-and-recapture surveys on two lakes in each of the years 1987 and 1988, and intends to conduct two to four such surveys in 1989.

b. Abundance sampling
Department of Natural Resources biologists have tried sampling young-of-the-year classes in the fall, or yearling classes in either the spring or fall, as a means of determining adult abundance, but the results have not been useful for making population estimates. Such sampling does indicate how many fish are in a lake for different sizes and different species.

2. Indirect methods of estimating population

a. Regression model
Regression analysis provides a means of determining a relationship between a dependent variable and independent variable for a given population. In fish biology, it may be used to determine the relationship between a known fact, such as the size or water quality of a lake, and an unknown fact, such as the size of the walleye population in the lake.
Department of Natural Resources and tribal biologists have tested regression models using average numbers of fish per acre to estimate walleye population on lakes lacking any previous direct (mark-and-recapture) estimate of population. Prior to 1988, the state and tribal biologists used a regression model that incorporated any population estimate, regardless of its age, or, if multiple population estimates existed, an average of those estimates. In 1988, the model incorporated all existing population estimation data to produce a more accurate estimate of the average density of walleye populations in relation to the size of the lake.
When department and tribal biologists have used the mean confidence level derived from the analysis, their estimates have been inaccurate: they have indicated a larger population than actually existed. Department biologists believe that using the low confidence level (or 95th percentile) would give them a reliable basis for a population estimate. They anticipate also that the accuracy of the estimate can be improved as additional information is gathered about the known facts with which they are working.

b. Morphoedaphic index
A morphoedaphic index is another form of indirect population estimator that utilizes the size of the lake and the amount of nutrients contained in the lake to derive the total fish yield of the lake. It may be possible to make a separate computation to estimate the biomass of a particular species, but such a computation is still being developed.
The morphoedaphic index gives a "factor of two" precision, that is, if the prediction is that a lake would produce one pound of fish per acre per year, in actuality the lake *1045 would produce between .5 and two pounds per acre per year.
The morphoedaphic index is not suitable for use in lakes that have very rapidly fluctuating water levels in the course of a year, or in which the ions are in inappropriate ratios. It has been used successfully in northern Ontario in opening up for commercial fishing several hundred of the largest 100,000 lakes in a one hundred and fifty thousand square mile area.

c. Catch per unit of effort
Catch per unit of effort measures relative abundance of a fish population, in terms of number of fish per acre. It can be used to derive an estimate of absolute population by multiplying the surface acreage of the lake by the number of fish per acre. CPE estimates are used to make relative comparisons of population numbers with other lakes or with the same lake in prior years. The index may be used to monitor catch.

B. Harvest Measurement

1. Creel survey

A creel survey is a statistical sample of the fish harvest in a particular body of water. It can be conducted in a variety of ways: by interviewing all or many of the individual fishers on a lake on any given day, or by requiring all persons fishing on a particular lake to register their catch every day; or by monitoring a particular harvest.
Such a survey provides no information that can be used to make population estimates; it is a measure of exploitation only. The survey will allow the detection of significant changes in sport angling effort and exploitation rates from year to year, although it is not effective in detecting small changes of this kind.

2. Creel census

A creel census differs from the a creel survey in that it is an actual count of each harvested fish by on-the-site monitors. Both the Department of Natural Resources and GLIFWC have engaged in such censuses of the Indian spearing harvest.

IV. FISH MANAGEMENT

A. In General

1. Primary and secondary objectives

Fisheries managers have as their primary objectives the maintenance or achievement of naturally-reproducing, self-sustaining stocks of fish, and the prevention of the elimination of fish populations through overfishing or other causes. Maintaining a naturally-reproducing population requires preservation of some minimum number of adult spawners in each stock, as well as the minimum number of individuals necessary for genetic diversity. The latter is important, as it appears that small communities of animals tend toward genetic drift â a condition in which the diversity of genetic material is lost with the result that the animals become more vulnerable to extinction from a common disease, climatic change, or other natural occurrence. Biologists have not determined what the minimum genetic number is for walleye and muskellunge populations; the parties to this case have agreed that the basic minimums for healthy, reproducing walleye populations are three adult spawners per acre, and five year classes of females in a sample or three year classes in a sample of 100 females that each contribute at least fifteen percent of the sample.
Secondary management objectives are determined by the kind of fisheries that are being managed. In commercial fisheries, the objective will be the greatest safe utilization of the resource; in a sport fishery, the objective may be a broad spread of number of year classes and a minimal rate of exploitation.
Commercial fishers have a strong incentive to take whatever portion of the harvest they can capture, which makes regulating them more difficult than regulating fishers for whom the effort and the trip are often as important as the harvest.

2. Risk avoidance

Fish biologists try to prevent overfishing events that lead to the elimination of fish *1046 populations, such as those that have occurred in Lake Erie and in Lake Michigan in recent years. Overfishing occurs when total extraction is greater than the harvestable surplus. Although overfishing in one year does not mean necessarily that the stock will be destroyed or "collapse" the next year, repeated overfishing events pose serious risk to the stock. (In collapse, the number of adult spawners declines, there is recruitment failure (failure of juveniles that reach sexual maturity), and the stock reaches such a low level it cannot be harvested.) Exploitation greater than 50 per cent of an adult fish population on two occasions within five years puts the stock at high risk. The risk is accentuated for walleye because of the variation among year classes, and for muskellunge because of their poor reproductive capacity.
Overfishing is difficult to detect unless the stock is monitored scientifically. Catch information may not indicate the strength of the stock: in some situations, record catches have been observed immediately preceding the collapse of a fishery.
Overfishing causes population instability in the target stock. Age structure becomes truncated, which can lead to a loss of recruitment. In extreme cases it can lead to collapse of the stock or to total extinction of the species. Overfishing can have ramifications for an entire lake community as well, particularly if the target stock is a predator. If predators are fished to very low levels, another species may assume the predator role and prevent the target species from resuming its function.
Small lakes are more vulnerable to overfishing than are larger ones. In small lakes, inaccurate estimates of population and safe harvest pose higher risks simply because of the smaller number of adult spawners and the smaller number of individual fish generally found in the such lakes.
Stocking is not a cure for overfishing. Not only is it difficult and expensive to produce the fry and fingerlings for stocking, the stocked fish often have difficulty reproducing in the wild. Biologists think that this is a result of either the hatchery-rearing process, which may deprive the fish of the learned behavior it needs for reproduction, or of a lack of genetic information. Rebuilding depleted populations has been more successful when remnant wild populations exist from which the stocked fish can learn reproductive behavior.
Overfishing is not the only risk to fish stocks. Other anthropogenic (human-caused) risks include degradation or elimination of the spawning environment and pollution.

B. Fisheries Management in Wisconsin

The Department of Natural Resources manages the roughly 14,000 inland lakes within Wisconsin, 11,000 of which are within the ceded territory; the portion of the Great Lakes under Wisconsin's jurisdiction; and the major river systems within or abutting the state. The fisheries within the state are a combination of recreational and commercial fisheries. Commercial fisheries exist on Lake Michigan and Lake Superior, on some inland lakes (limited to rough fish), and a set line fishery for catfish on the Mississippi River. The state's non-commercial fishery is limited to angling for recreational purposes. Estimates of its value range from about $500 million to $700 million in direct expenditures by anglers for activities relating to their fishing.
Since the middle of the 19th century, the trend in the state's fisheries management has been to reduce the efficiency of gear that could be used for fishing on the inland lakes. Gillnets and spearing were banned in the 19th century, and later, sales of trout and other species were prohibited. The present management strategy is to disperse the fishery widely and keep it relatively inefficient so that stocks can be sustained.
The state's management objectives for the walleye fishery are the following:
1. To maintain or achieve self-sustaining walleye populations, at abundance levels commensurate with available habitat and food. Indicators of healthy reproducing populations are three adult spawners per acre, and five year classes of females in a sample or three year classes in a sample of 100 females that *1047 each contribute at least fifteen percent of the sample. Populations that fall below these levels typically require management actions such as harvest restrictions or stocking. These levels might be referred to as "action levels."
2. To maintain or achieve walleye populations that optimize fishing opportunities, by increasing abundance or growth rates. Increase abundance in lakes with poor reproduction, over-harvest, or high natural mortality. Increase size of fish in lakes with over-harvest or over-population.
3. To maintain or achieve walleye populations that, through predation, optimize abundance and/or growth rates of other species.
4. To promote stability of desired populations.
Given the number of walleye and muskellunge in the ceded territory, and the wide distribution of the two species, it is unlikely that allowing unregulated tribal spearing or gillnetting would result in the extinction of the species. However, it is likely that such fishing could result in the collapse of fish stocks in many lakes.

1. Management of angling fishery

Although angling is a high effort, low efficiency method of fishing, the number of individuals engaged in it makes it an intensive fishery, in terms of its effect upon fish stocks. In the years 1980-1987, sport angling effort in the ceded territory targeted at walleye averaged 16,150,710 hours annually, resulting in an average annual harvest of 672,303 fish. On the larger lakes, the angling exploitation is estimated to be 20-25% percent of the fish population.
The Department of Natural Resources calculates exploitation rates for sport angling exploitation by conducting mark-and-recapture surveys followed later by creel surveys to determine what component of the population has been harvested.
Despite the intensity of the angler fishery, it has not posed a significant threat of overfishing, and what threat it does pose can be dealt with by imposing additional restrictions on bag size, length of seasons, minimum sizes, etc. For example, the Department of Natural Resources will be imposing additional restrictions on angling fishing in the next few years, pursuant to a comprehensive long-term fisheries plan it developed in the late 1970's. (These restrictions would have been imposed even if the tribes' treaty rights had not been judicially recognized. It is purely fortuitous that the time for their implementation came shortly after the start up of Indian spring spearing.)
Recreational sport angling is allowed on lakes under 500 acres in size. On Escanaba Lake, the department's research lake, angling walleye exploitation has exceeded 37% of the population in three of the last four years. The average exploitation has been 28%. Escanaba is a 294 acre lake located within the ceded territory. The department imposes almost no restrictions on fishing in the lake, such as seasons or bag or size limits, except that each fish caught must be registered. Angling tends to harvest younger walleye and muskellunge. Minimum size limits for muskellunge are intended to preserve individual fish so that members may spawn and contribute to reproduction.
The management of an angling fishery does not require intensive monitoring when stocks are relatively abundant. The Department of Natural Resources has been successful in preserving and enhancing walleye and muskellunge stock in inland lakes for an angling fishery throughout the state under the current management approach.

2. Tribal treaty fishery

a. Operation since 1983 under interim agreements
Since plaintiffs' usufructuary rights were judicially recognized in 1983, the tribes and the Department of Natural Resources have worked together to implement and manage a tribal treaty fishery for walleye and muskellunge. To this end, the tribes and the department have negotiated four interim agreements covering the *1048 spring spearing fishery and a gillnet assessment plan.
Beginning in 1985, the tribes have engaged in off-reservation spring spearing during walleye spawning season. From these efforts, the department has learned that it is possible to harvest as many as 78 walleye in one hour on one trip; that tribal members have been able to harvest as many fish as permitted, restricted only by the weather and by the number of fish present at spawning; and that the tribal harvest tends to take older fish than the angling harvest. The department has not learned whether the disturbance of the spawning grounds, the use of lights, or any other aspect of spearing has any effect on walleye or muskellunge reproduction.
Under the interim agreements, both the Department of Natural Resources and GLIFWC have been involved in monitoring the spearing harvest. The agencies provided monitoring teams that met the spearers at the landings when they returned with their harvest and counted the total catch and also measured and determined the sex of a sampling of the fish.
In 1985, plaintiff tribes harvested 2,791 walleye; in 1986, they harvested 6,940 from 31 lakes; in 1987, they harvested 21,321 from 67 lakes; and in 1988, they harvested 25,969 from 92 lakes. In 1985, 1987, and 1988, plaintiffs' spring walleye harvest was limited to lakes 500 acres or larger. In 1986, their spring walleye harvest was limited to lakes 1000 acres or larger.
During 1986, plaintiffs harvested over 80% of the quota provided them under the interim agreement from 20% of the lakes in which they speared. In 1987, plaintiffs harvested over 80% of their quota from 34% of the lakes in which they speared. In 1988, plaintiffs harvested over 80% of their quota from 39% of the lakes in which they speared.
Plaintiffs have the capability of spearing 30,000 to 35,000 walleye during the 1989 spring spearing season.
Plaintiffs harvested 85 muskellunge in 1985, 55 in 1986, 196 in 1987, and 158 in 1988. Their muskellunge harvesting was limited to lakes of 500 acres or more in 1985, 1987, and 1988, and to lakes of 1000 acres of more in 1986. Under the interim agreements, muskellunge were not targeted for spearing. The muskellunge harvest was incidental only.
The resumption of a spearing harvest on inland lakes has created a need for additional, more reliable information about fish stocks because of the tribes' predicted ability eventually to harvest up to the limits of the quotas negotiated under the interim agreements. It is particularly important to have accurate population estimates because of the impact of intensive fishing methods upon fish stock. Unlike the largely self-regulating angling fishery, the spearing fishery has an immediate effect upon the fish stock and it has no self-regulating features.
Safe management of a spearing fishery requires a precise estimation of the number of fish available for harvest, or a "Total Allowable Catch." Under the interim agreements, state and treaty biologists have used a variety of methods to estimate walleye stock and derive a total allowable catch from which the tribal quota has been set on a lake by lake basis. The parties have developed independent, conflicting proposals for determining total allowable catch and tribal quota on a long term basis.

V. MANAGEMENT PROPOSALS FOR TREATY HARVESTING OF WALLEYE AND MUSKELLUNGE

A. NR 13

The department has formulated a special administrative regulation covering the usufructuary activities of the plaintiff tribes. The measure was approved by the department's board in February 1988, and became effective with publication on October 5, 1988. (The two subdivisions of NR 13 of particular relevance to this opinion, NR 13.13 and NR 13.14, are reproduced as an appendix to this opinion.) The measure governs all aspects of walleye and muskellunge harvest through two kinds of provisions: those that limit the plaintiffs' conduct directly and those that set criteria by *1049 which the department will manage the resource. It was drafted for a shared, or mixed, fishery. NR 13 leaves almost unrestricted the plaintiffs' use of less efficient harvest methods, such as set poles and lines, bank poles, hook and line and ice fishing. Under the proposal, tribal members may catch as many fish by less efficient methods as they want, from whatever public access lake or stream they may choose, unrestricted by seasons, bag limits or size limitations. Spring spearing, netting, and snagging are governed by a quota system similar to the process used under the interim agreements.
Under NR 13.14, spearing is limited to lakes greater than 500 acres; gillnetting is limited to lakes greater than 1000 acres. No spearing or gillnetting may occur on any lake of whatever size unless the lake has had a population estimate made within the previous two years. The estimate must be either a mark-and-recapture survey or another method agreed upon by the parties. One of the purposes of requiring that a lake have a population estimate no more than two years old is to ensure that lakes not be subjected to efficient fishing methods more than two years in a row, without the opportunity for the department to assess the impact of the fishery on the particular lake.
NR 13 sets a tribal quota (TQ) of 20% of the total allowable catch (TAC). The quota works as follows: beginning with a theoretical population in the lake (the population estimate), the biologists apply an exploitation rate of 35% for walleyes and 27% for muskies that has been stipulated to by state and tribal biologists. (These rates are subject to review and revision as scientific information about the fish stocks permits more precise management.) The product of the population estimate times the exploitation rate is the Total Allowable Catch. The concept of a Total Allowable Catch is used worldwide in the management of efficient fisheries. It represents the number of fish in excess of the number needed for spawning or, in other words, that component of the fishery not needed for reproduction.
If the population of a particular lake were known, the Total Allowable Catch could be harvested without risk to the fish stock. For lakes that have a one-year old mark-recapture survey, defendants use a safety factor of 35% to derive the safe harvest for walleye. For lakes that have a two-year old mark-recapture survey, defendants use a safety factor of 30%. For lakes that have had a mark-recapture survey done within the preceding two years, defendants use a safety factor of 35% to derive the safe harvest for walleye. (Another way of achieving the same result is to do as defendants have done in NR 13: allocate plaintiffs 20% of the Total Allowable Catch (TAC being population estimate (PE) times exploitation rate of 35%). The resulting safe harvest estimate is then divided between the high efficiency methods used by plaintiffs and the low efficiency angling harvest.
Thus, in a lake estimated to contain 100 walleyes, 12 walleye (100 Ũ .35 Ũ .35) could be caught without unduly risking the viability of the stock. Of these, NR 13 would make 7 available for spearing and 5 for anglers. In the real world, only the statistically average lake contains 100 walleyes; using defendants' method of calculating the population estimate on the basis of a mark-and-recapture survey, the probability is that the lake contains no fewer than 40 and no more than 170. In the lake with the smallest number of fish, a harvest of 35 would leave only five fish in the lake. On the other hand, in the lake with the largest number, a harvest of 35 would leave 135 fish unharvested that could have caught without risk to the stock.
Defendants made the decision to limit plaintiffs' harvest by efficient fishing methods to 20% of TAC for several reasons: they believed it would provide plaintiffs with approximately the same number of fish that plaintiffs had been taking under the interim agreements; it provided a margin of safety for a fishing method whose effects were still largely unknown; and it was a means of allocating the fish in a mixed fishery. If plaintiffs were permitted to take the total safe harvest, that is, the product of the safety factor times the exploitation rate times the population estimate, or 12 walleye from a lake estimated to contain 100) of any species from any lake, it would be necessary to close that *1050 lake to further fishing for that species by any method by Indians or non-Indians.
NR 13 contains no requirement that the department make a minimum number of mark-and-recapture surveys in any given year, or that it make any at all. The rule contains no provision for population estimates made by any other method, although it does provide that other standardized sampling methods may be developed and used "by agreement with the tribes." NR 13.13(d). It leaves to the discretion of the department the choice of which lakes to survey. (However, during the course of the trial defendant's counsel stated that it had no objection to a court order requiring it to conduct a certain number of surveys each year.) NR 13 provides no method of negotiating or reviewing the calculations used by the department to determine Total Allowable Catch. It does not provide explicitly for tying the amount of tribal quota to the amount of harvest sought by plaintiffs.

B. Tribal Code and Management Plan

1. Tribal organization

Each plaintiff tribe is a member of the Great Lakes Indian Fish and Wildlife Commission, which is an inter-tribal, interstate organization operating under a constitution ratified by each member tribe. It was established in 1984, and has three committees organized by the geographic area of the member tribes' treaties. One of these is the Voigt Inter-Tribal Task Force Committee, which directs the commission's activities related to the land and resources in the 1837 and 1842 cession areas and is composed of representatives of the eight tribes with reservations located within the area ceded by these treaties in Wisconsin, Michigan and Minnesota.
The member tribes have delegated to GLIFWC the authority to employ conservation wardens to monitor and enforce the off-reservation conservation regulations enacted by the member tribes.
The Voigt Task Force has primary responsibility for intertribal co-management and regulation of off-reservation resources. It reviews and approves management plans, develops and recommends seasonal agreements with the Wisconsin Department of Natural Resources and the United States Fish and Wildlife Service and recommends implementing regulations to the plaintiffs.
GLIFWC provides biological and resource management support services to the Voigt Task Force to assist the task force in carrying out its responsibilities.
Each plaintiff tribe has authority to enact harvest regulations, which may be more, but not less, restrictive than the recommendations of the Voigt Task Force. The combined harvest of any species by the members of the plaintiff tribes is limited to the overall harvest goals and quotas for each species approved by the task force and developed by the commission staff.
GLIFWC's Biological Services Director has authority to terminate the combined harvest of any species whenever it is the director's judgment that continued harvest is likely to exceed the harvest goals or quotas adopted by the task force or would otherwise result in biological harm. The task force establishes harvest goals and quotas annually for walleye and muskellunge, relying upon the recommendations of GLIFWC's Biological Services Division. The task force sets a harvest level for walleye for each body of water on which harvest by any method is contemplated. It bases the harvest levels upon the determination of the Biological Services Division of those off-reservation waters within the ceded territory that are capable of sustaining a harvest of walleye during the fishing year.
In June 1988, GLIFWC drafted a Management Plan and Model Code of Ordinances Governing Off-Reservation Harvest by Tribal Members. The plaintiff tribes have approved the tribal management plan through their Tribal Governing Bodies, and two of the tribes have enacted it.
Under the Model Code, GLIFWC's staff will transmit harvest and other biological data to the Department of Natural Resources. Commission personnel will consult representatives of the department regarding *1051 review of harvest goals, management plans, seasonal agreements, and emergency closures, and will participate in joint technical working groups and in the review and comment on department management plans and regulations.

2. Structure of Management Plan

Plaintiffs' management plan is set out in four separate documents. The first, the Management Plan, describes biological characteristics of the walleye population, on which are based the Plan's regulatory principles, guidelines, and plans for further research and regulatory development. The second document is the Intertribal Agreement, which describes the delegation of authority for the making of critical regulatory decisions. The third document is the Voigt Task Force Protocol, which sets out in detail the procedure to be followed in determining annual walleye harvest and quota. Finally, the Model Conservation Code sets forth a number of substantive fishery regulations and the mechanism for enforcing quota limits.

3. Tribal code

Prior to trial the tribes developed a management plan setting forth methods for computing the tribal quotas to be applied to each body of water that would be subjected to intensive fishing methods. During the course of trial, the Biological Services Director of GLIFWC, Thomas Busiahn, revised the computations downward, producing smaller tribal quotas. Although the revised computations had not been submitted to the tribes or to GLIFWC for approval, plaintiffs' counsel have used the new figures as the basis for their proposed findings of fact. In summarizing and evaluating the tribes' management plan, therefore, I will assume that the revised figures are incorporated into that plan.
Under the tribal management plan, for walleye populations that do not exhibit indicators of a healthy stock, and for walleye populations without information regarding such indicators, the Biological Services Director will set the Total Allowable Catch at 20 per cent of the estimated population of each lake on which plaintiffs intend to use high efficiency fishing methods. For walleye populations that do exhibit indicators of healthy stock, the Biological Services Director will set a Total Allowable Catch at 35 per cent of the estimated population.
To arrive at the tribal quota from the Total Allowable Catch, the Biological Services Director will apply a discount to the Total Allowable Catch, based on the nature and age of the population estimate. Thus, for walleye populations that have had a mark-and-recapture estimate within the preceding two years, the safe harvest level will be set at 50 per cent of the total allowable catch. The safe harvest level will be the tribal quota. For walleye populations with mark-and-recapture estimates more than five years old, and for walleye populations estimated by the regression formula rather than by mark-and-recapture, the Biological Services Director will calculate the safe harvest level as 20 per cent of total allowable catch. For walleye populations dependent wholly or primarily on stocking for recruitment, the Biological Services Director will assume the population size to be 1.4 per acre, and will calculate total allowable catch as 35 per cent of the population size, and the safe harvest level as 50 per cent of the total allowable catch.
The following chart sets forth the tribal managment plan, together with the accompanying level of risk that the particular tribal quota will result in a harvest in excess of the target exploitation.

 Risk that
 TQ exceeds
 Population meets Population doesn't target
 objectives meet objectives exploitation
-------------------------------------------------------------------------------
Lakes with mark-recapture
 P.E.'s
 1-2 years old .35 Ũ .50 .20 Ũ .50 10.0%

*1052
 Risk that
 TQ exceeds
 Population meets Population doesn't target
 objectives meet objectives exploitation
------------------------------------------------------------------------------------------
 3-5 years old .35 Ũ .50 .20 Ũ .30 4.7%
 5+ years old .35 Ũ .20 .20 Ũ .20 2.7%
Lakes without
 mark-recapture
 P.E.'s Regression P.E. Regression P.E. 5.0%
 P.E. Ũ .35 Ũ .20 P.E. Ũ .20 Ũ .20
All stocked lakes (Use recent P.E. or 1.4 per acre)
 P.E. Ũ .35 Ũ .50 Case-by-case per
 management objectives 16.7%
-----------------------------------------------------------------------------------------

Under the tribal plan, as revised by Busiahn, the total allowable catch for muskellunge will be set as follows: the Biological Services Division will estimate the muskellunge population on the basis of the lowest observed population density for the species, that is, .1 fish per acre in lakes with stocked muskellunge populations, and .2 fish per acre in lakes with naturally reproducing populations. The division will determine the maximum safe harvest of muskellunge by multiplying the estimated population in a particular body of water by the exploitation rate of 27 per cent, and multiplying the result by 50 per cent to calculate the safe harvest. Harvest will be terminated when the limit of the safe harvest is approached. The safe harvest levels for lakes with stocked populations is one muskellunge per 75 acres; for lakes with naturally reproducing populations, the safe harvest level is one muskellunge per 37 acres.
On or before January 15th of each year, the Biological Services Division is to provide the Voigt Task Force with the tribal quotas it has determined for each body of water. The tribes then register their harvest goals in terms of their potential harvest capability and designate the lakes and the portions of the allowable tribal quota they intend to take. By February 15, the task force must set the number of walleye that the tribes will seek during the season, which runs from April 1 to the following March 31.
The task force harvest level determination includes all fishing methods: hook and line, ice fishing, netting, and spearing. It establishes a quota for walleye for each lake named by a member tribe. The quota cannot be exceeded. If the task force does not establish a quota for any lake, tribal members may not harvest fish from that lake by any method.
By March 15th of each year, the task force will issue and provide to the Department of Natural Resources the walleye quotas for each lake on which tribal harvest is contemplated.
Tribal monitoring will include total fish counts, length and weight data, scale samples, spine samples, and other data including catch per unit effort. The plan requires annual and daily fishing permits of all tribal members who wish to fish in the ceded territory for walleye or muskellunge by netting or open water spearing.
Under the plan, the director of the biological services division has complete discretion to determine the acceptable risk levels and decide whether a lake meets some form of population goals. The director has total responsibility for resolution of harvest share disputes. The tribal plan provides no method for setting tribal quotas in subsequent years to avoid compounding the problem of overfishing in particular lakes. It makes no provision for safe harvest by non-tribal members. Plaintiffs' plan makes no attempt to regulate any aspect of non-Indian fishing.

OPINION
What the parties in this case have done to give practical effect to plaintiffs' judicially recognized treaty rights is a remarkable story. It is remarkable in its own right; it is even more so when contrasted with the very different reaction by the *1053 State of Washington to the judicially recognized fishing rights of the Indians in that state.
In Washington, the state game department refused to comply with the federal district court's order to promulgate and enforce regulations in compliance with the court's decree, and the state courts had forbidden the fisheries department to comply, so that it became necessary for the federal court to take over direct supervision of the state's fisheries. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, Inc., 443 U.S. 658, 673, 99 S.Ct. 3055, 3068, 61 L.Ed.2d 823 (1979) (hereafter Fishing Vessel). Nontreaty fishers openly violated Indian fishing rights, id., 443 U.S. at 692 n. 32, 99 S.Ct. at 3078 n. 32, and the district court
had to resort to the outer limits of its equitable powers in order to enforce its decree ... includ[ing] taking over supervision of all of the commercial fishing in the Puget Sound area, ordering the creation of a telephone "hot line" that fishermen [could] use to determine when and where they [might] legally fish, and ordering United States Marshals to board fishing craft and inspect for violations of the court's preliminary injunction.
Id. at 706-707 n. 9, 99 S.Ct. at 3085 n. 9. The Court of Appeals for the Ninth Circuit noted that the district court had "faced the most concerted official and private efforts to frustrate a decree of a federal court witnessed in this century ... except for some school desegregation cases." Puget Sound Gillnetters Ass'n v. United States District Court, 573 F.2d 1123, 1126 (9th Cir.1978) (quoted in Fishing Vessel, 443 U.S. at 696 n. 36, 99 S.Ct. at 3080 n. 36). The Solicitor General of the United States advised the Supreme Court that
[T]he default of the state government has required the United States to concentrate a disproportionate amount of its limited fisheries enforcement personnel on what is essentially a local enforcement problem. Agents of the National Marine Fisheries Service, the United States Fish and Wildlife Service, the United States Marshals Service, and the Coast Guard have been diverted from their regular duties to assist the district court in implementing the Indians' treaty rights. This has resulted in a reduction in the federal fisheries services available for the rest of the country and for the enforcement of the ocean fisheries programs governed by the
Fishery Conservation and Management Act of 1976. Fishing Vessel, 443 U.S. at 707 n. 9, 99 S.Ct. at 3085 n. 9 (citation omitted).
It is to this state's credit that its officials did not adopt the recalcitrant attitude of the State of Washington, but chose instead to work to adjust the state's resource management programs to accommodate the newly-recognized rights of the tribes. The effort has not been an easy one. The court orders provided no real guidance for translating a treaty right into a harvest opportunity. The lengthy and contentious Washington litigation provided examples to avoid, but no constructive help in complying with court decrees covering an altogether different kind of fishery problem. The scientific literature contained very little information about managing mixed fisheries in lakes that would accommodate both the highly efficient fishing methods of spearing and gillnetting and the inefficient method of angling. The Department of Natural Resources has had to develop much of its own information, either in-house or in conjunction with the State-Tribal Technical Working Group, an advisory group composed of biologists from the department and from the Great Lakes Indian Fish and Wildlife Commission. This group and the related Biological Issues Group addressed biological problems put to them by state and tribal negotiators, developed strategies for harvests, performed assessments of different kinds of fishing and worked to narrow the scope of the biological issues that would have to be tried to the court. It is no exaggeration to say that in doing this, the biologists have been on the cutting edge of fisheries biology and management issues.
The department has negotiated a number of interim agreements with the tribes covering *1054 the harvesting not only of walleye and muskellunge, but other species of fish, deer, small game, migratory birds, bear, and wild rice. Its wardens, along with other state and local law enforcement officers, and GLIFWC personnel, have monitored the agreements to ensure that Indian hunters and fishers have been able to implement their treaty rights. The department has done this in the face of intense opposition from individuals and groups opposed to the recognition and implementation of Indian treaty rights, with only the most modest amount of federal assistance in the form of funding for some assessment projects.
It is to the tribes' credit that they have adopted an equally cooperative attitude toward the implementation of their rights. It has not been an easy time for them, either. The tribes and their members have been subjected to physical and verbal abuse over the recognition of their treaty rights, most publicly when they have attempted to exercise their treaty rights to spearfish, but not only then. Harassment has become a fact of life for them.
Tribal members have negotiated and entered into a series of interim agreements with the state that have circumscribed their rights to accommodate state concerns, despite their understandable impatience to reap the benefits of treaty rights they have been forced to forgo for so many years.
Each tribe has joined the Great Lakes Indian Fish and Wildlife Commission; each plaintiff tribe is also a member of the Voigt Inter-Tribal Task Force. GLIFWC has hired trained fisheries biologists who participate in the State-Tribal Technical Working and Biological Issues Groups that have produced the working papers and biological issues stipulations so helpful to the court, to treaty rights negotiators, and to fisheries managers. GLIFWC wardens have participated with DNR wardens and other state and local law enforcement officers in the monitoring and enforcement of the tribal fishing efforts under the interim agreements.
Both the tribes and the officials of the State of Wisconsin responsible for implementing the tribes' treaty rights can take pride in their accomplishments over the last six years. They deserve widespread recognition and appreciation for their efforts.
As I have noted, the parties have resolved most of the disputed issues of this regulatory phase of the case. For the few issues that remain to be determined by the court, the parties have chosen to focus on walleye and muskie â for good reason. The two species are probably the most-highly prized in the entire ceded territory and their management implicates the major issues between the parties.
A threshold issue must be addressed. Plaintiffs contend that NR 13 is non-justiciable, for a number of reasons. Although it appears that they are not actively pursuing this issue, I will address it briefly. I conclude that plaintiffs' arguments are without merit. To begin with, plaintiffs have not submitted any sort of factual record in support of the motion, despite their reliance in their briefs on a number of asserted facts. Second, their argument that the provision is invalid because it attempts to overrule a state statute is groundless. This court and the Court of Appeals for the Seventh Circuit have held that the state cannot enforce its natural resource regulations against members of the plaintiff tribes. NR 13 is defendants' attempt to fill in the gaps that result from that determination. Third, NR 13 is currently in effect; even if it were not to be extended as defendants anticipate, it does not expire until March 5, 1989. Finally, it is not necessary to have a promulgated regulation before the court to give rise to a controversy; the controversy between the parties is direct, precise, and very real.
I turn then to a discussion of that controversy and to the validity of the disputed provisions of NR 13. Although it is plaintiffs who are seeking to enjoin the defendants from interfering with any aspect of their usufructuary rights, it is defendants who bear the burden of showing, first, that there is a need for them to regulate any aspect of the tribal harvest, and second, that the regulating they propose to carry out is reasonable and necessary *1055 and does not discriminate against the Indian harvest. Defendants contend that they have shown plaintiffs' inability to manage their walleye and muskellunge harvesting free from state regulation, and that the state's proposal for managing the harvest, NR 13, meets the required criteria for enforceability of necessity and reasonableness.
There is no question but that NR 13 is a good faith attempt by defendants to give practical effect to the judicial decisions in this case. It recognizes the plaintiffs' paramount rights to harvest the resources in the ceded territory. It accommodates plaintiffs' use of high efficiency fishing methods, which give them almost complete assurance that they will achieve their harvest goals; it incorporates plaintiffs' right to spear during the spring spawning season when non-Indians are not allowed to fish by any method; and it acknowledges, implicitly, that angling fishing may have to be restricted in certain lakes in order to accommodate the Indian harvest. The regulation makes it explicit that plaintiffs and their members are free of the majority of restrictions applicable to non-Indian fishers, with the exception of those few the parties have agreed will continue to apply to tribal members.
However, NR 13 cannot be imposed upon plaintiffs if their tribal organization, resources, and proposed harvest plan are sufficient to regulate tribal members' off-reservation harvesting activities and conduct and protect the resources at issue. LCO IV, 668 F.Supp. 1233, 1241; United States v. State of Washington, 520 F.2d at 686 (where tribes responsibly insure that conservation and public health and safety goals are being met, legitimate interests of state are not contravened); United States v. Michigan, 653 F.2d 277, 279 (6th Cir. 1981) (state may regulate tribal members' fishing only in "the absence of effective Indian tribal self-regulation").
Defendants have not shown that the plaintiffs do not have the attributes found necessary for self-regulation in United States v. Washington, 384 F.Supp. 312, 340-341 (W.D.Wash.1974), aff'd, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976): competent and responsible leadership, well organized tribal government reasonably competent to promulgate and apply tribal off reservation fishing regulations, trained personnel competent to provide effective enforcement of all fishing regulations, qualified experts in fishery science and management, officially approved tribal membership rolls, and provision for tribal membership certification.
Defendants have shown inadequacies in the tribal harvest plan. However, defendants have not shown that plaintiffs cannot adequately regulate their members in compliance with an amended plan that is adequate to protect the resources. The defects in the plan do not require a finding that the tribes are incapable of self-regulation, provided they enact plans that correct the defects. See Washington, 384 F.Supp. at 340-341. If the tribes enact tribal regulations that establish to the satisfaction of the Department of Natural Resources or to this court that they can meet certain conditions, discussed below, which defendants have shown are reasonable and necessary for conservation, the state cannot regulate tribal members' off-reservation fishing for walleye and muskellunge, so long as that fishing remains in compliance with the plan.

Biological Conditions

1. Minimum lake sizes for gillnetting

Defendants have shown that a minimum lake size of 1000 acres for gillnetting is reasonable and necessary for conservation. The lack of information about gillnetting catches, the real potential for incidental catch of muskellunge and other non-targeted fish, and the irreparability of any over-fishing incident, compel the conclusion that allowing such netting in smaller lakes would pose an unacceptably high level of risk to the fish populations in those lakes.
Defendants have never contended, and there is no basis for finding, that either the muskellunge or the walleye is in danger of extinction from the ceded territory *1056 if plaintiffs' rights are not restricted to some degree. They have shown, however, that unrestricted fishing could cause the collapse or even the extirpation of the stock of a particular lake, with the consequence that the lake might never again sustain such a stock. This legitimate concern merits consideration. Defendants need not show that a particular rule or regulation is necessary to preserve the entire species from extinction within the ceded territory; they need show only that the measure is necessary to preserve the stocks in the majority of the walleye and muskellunge lakes. See Department of Game of Washington v. Puyallup Tribe, 414 U.S. 44, 49, 94 S.Ct. 330, 333, 38 L.Ed.2d 254 (1973): "Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival." (Emphasis added.) Defendants have shown the conservation need with respect to minimum lakes sizes for gillnetting. The risks this fishing method poses to walleye and muskellunge stocks justify the lake size requirement sought by defendants. Any plan enacted by plaintiffs must incorporate this requirement.
Plaintiffs argue that it would be less restrictive of their rights to permit them to gillnet on smaller lakes, subject to additional restrictions on the size and length of the nets they may use. However, plaintiffs have previously agreed to certain net size restrictions, which makes their proposal unworkable even if it plaintiffs could show that it would protect the species in the smaller lakes. They have failed to do so. Even shorter lengths of nets with different net size openings can harvest an unexpectedly large number of fish in any one incident. In a smaller lake one such incident could be devastating to the fish stock.

2. Minimum lake sizes for spearing and use of live nets

Defendants' proposed minimum lake size for spearing, fyke and dip nets, and seining is less justifiable than is the proposal for gillnetting. Because spearing is monitored intensively and the fish in these kinds of nets are alive when caught, these fishing methods do not raise the same spectre that irremedial overharvesting will occur in a single incident as in the case of gillnetting.
The defendants' concern with opening lakes smaller than 500 acres to spearing and live nets is that the costs associated with obtaining the requisite population estimates, monitoring the harvest, protecting the harvesters, and checking exploitation rates make the cost far exceed any possible benefit to the tribes. Defendants argue that with finite budgets, their time and money and that of the tribes' can best be spent on the larger lakes that will produce larger harvests. Plaintiffs maintain that proximity to their reservations, unusual fish density, or cultural and traditional considerations make it desirable to open some smaller lakes to spearing, despite the low return for the costs incurred.
Although it seems doubtful that the plaintiffs would commit their limited resources to spear on smaller, less productive lakes, defendants have not shown any risk to the conservation of the species if smaller lakes are speared. Therefore, subject to certain conditions to be set forth later in this opinion, plaintiffs' management plan need not exclude lakes smaller than 500 acres from those selected for spearing.

3. Restrictions on muskellunge harvesting

Defendants have shown that their proposal for a total limit on the number of muskellunge harvested is reasonable and necessary for conservation of this species. Although plaintiffs dispute the validity of the tribal quota on the total harvest of muskellunge proposed by the state (see condition 7 below), they concede that the defendants have shown a conservation need for such a limit, rather than the bag limit proposed originally by plaintiffs. Plaintiffs' plan must incorporate the total limit approach proposed by defendants.

4. Population estimates

Defendants have shown that accurate population estimates are necessary in *1057 order to conserve the fish stock in any lake subjected to highly efficient methods of fishing, including spearing and all forms of netting. Therefore, any plan plaintiffs enact must provide that highly efficient methods of fishing may not be used on any lake of whatever size, unless that lake has a reliable population estimate based either on a mark-and-recapture survey that is no more than two years old, or on the low confidence interval of a regression analysis performed according to protocol approved by the Biological Issues Group, or on any other method of obtaining a population estimate that has been approved by the Biological Issues Group.

5. Need for "pulse" fishing

Defendants have proven that it is necessary for conservation purposes not to have spearfishing or netting in the same lake more than two years in a row, so as to enable biologists to evaluate the actual impact on the fish stock of these intensive methods. Therefore, plaintiffs' management plan must ensure that tribal members do not subject any lake to intensive fishing more than two years in succession.

6. Right of selection of lakes for efficient fishing

Plaintiffs have the right to select the lakes in which they wish to spear and net, provided that the lakes selected have a reliable population estimate, are at least 1000 acres in size in the case of gillnetting, and have not been subjected to spearing or netting or both for the two years immediately preceding the year for which they are selected. In the case of spearing and live netting, plaintiffs have the right to select lakes smaller than 500 acres, provided that a reliable population estimate exists or can be obtained, and provided also that plaintiffs undertake to undertake all catch monitoring and that they provide defendants with all of the biological information they need. (This does not mean that plaintiffs are responsible at such lakes for monitoring the activities of persons opposed to the plaintiffs' exercise of their treaty rights.)

7. Size of tribal quota

The most difficult question raised in this trial is whether plaintiffs should be restricted to 20% of the Total Allowable Catch established for each lake and each species, when they are using high efficiency fishing methods, so that some portion of the safe harvest remains available for the angling fishery each year. Plaintiffs maintain, correctly, that such a requirement to that effect would be discriminatory, because it works a restriction on the tribal exercise of the fishing right, rather than upon the non-Indians'; that it is not a conservation measure necessary for preservation of the species; and that the limits it sets on the tribal harvest are an attempt to allocate resources without any showing that allocation is necessary.
Plaintiffs' position is that the tribes should have the opportunity to take the total harvest level they are capable of taking, up to but not exceeding the entire safe harvest in those lakes they select for highly intensive fishing. Defendants concede that the 20% tribal quota is less than could be taken from the lake if conservation were the only consideration. They maintain, however, that the restriction is a reasonable one that responds to the holding by this court that the tribal rights are held in common with non-Indians and that the restriction does not reduce the size of the harvest that plaintiffs may take by high efficiency means, but only requires the tribes to spread out the harvesting so as to lessen the impact on any particular lakes.
Defendants attack plaintiffs' proposal to take a larger share of the harvest by pointing out that it "assumes ... that the non-Indian fishery will respond to accommodate the intended treaty harvest." Defendants' Post-trial Brief, filed Nov. 23, 1988, at p. 47. Defendants are correct in their characterization of the plan but wrong in thinking it is subject to attack. In fact, plaintiffs' assumption is part of the law of the case. Defendants' right to regulate the exercise of treaty rights in the interests of conservation arises only if the state can show that conservation goals cannot be met by regulating *1058 the harvest of non-Indians. LCO IV, 668 F.Supp. at 1236-1237.
The comments of the Court of Appeals for the Ninth Circuit in United States v. Washington, 520 F.2d at 686, are relevant in this respect:
The state's program for management of the state's fisheries may appear sound and commendable, but the state shares its rights in those fisheries with another party. It may not force treaty Indians to yield their own protected interests in order to promote the welfare of the state's other citizens. The state must pursue its goals as best it can by regulating its own non-treaty Indian citizens.... Direct regulation of treaty Indian fishing in the interests of conservation is permissible only after the state has proved unable to preserve a run by forbidding the catching of fish by other citizens under its ordinary police power jurisdiction.
(Citation omitted.)
Defendants characterize their proposal for a 20% tribal quota as a fair means of allocating the in-common rights of the two groups, Indian and non-Indian, and ask the court to recognize both the need for allocation of the natural resources in the ceded territory and the justification for setting the allocation at 50% for the plaintiffs and 50% for non-Indians. (They do not explain precisely how the 20% tribal quota on selected lakes achieves a 50% share of the entire walleye and muskellunge resource in the ceded territory for the plaintiffs, or even whether it is intended to.)
I have stated on a number of occasions in the course of this litigation that the basis for allocation had not yet been shown. I repeat that statement. I acknowledge that defendants have shown the likelihood that, without the 20% tribal quota on intensive fishing in any particular lake, angling fishing by Indians and non-Indians will have to be restricted or barred altogether on lakes where spearing or netting has taken place. This suggests strongly that one of the prerequisites for allocation, the scarcity of the resource, may exist, at least on a lake by lake basis. However, defendants have cited nothing to support the concept of allocation in this case other than the in-common language in United States v. Bouchard, 464 F.Supp. at 1338, and the 50-50 split of the anadromous fish in Washington approved by the United States Supreme Court in Fishing Vessel, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823.
Defendants argue that the court has the equitable power to make such a split, even in the absence of specific treaty language or clear precedent. Much as I appreciate the concerns that animate defendants' request and the consequences for them of not having more guidance in the management of the state's resources, I reject the idea that this court or any other should make such a profoundly important decision on the basis of nothing more than a vague concept of equity. Fairness, or equity, resides on both sides of this case. The defendants' management difficulties (which I do not intend to minimize in any way) lie in the balance with the plaintiffs' rights to a harvest they have been denied for more than one hundred years. Being fair, or doing equity, suggests no clear way to resolve the dilemma that defendants face.
Moreover, defendants have not shown how an allocation between the parties should be made, or how it would work in this case. In the Fishing Vessel case, the court was dealing with a few species of fish that, in the words of the Supreme Court, raised management issues "more akin to the cultivation of `crops' ... than is the management of most other commercial and sport fisheries." "The regular habits of these fish make their `runs' predictable; this predictability in turn makes it possible for both fishermen and regulators to forecast and to control the number of fish that will be caught or `harvested.'" Id. 443 U.S. at 663, 99 S.Ct. at 3063. In this case, the resources at issue are far from predictable. Their unpredictability is what makes the questions of management and conservation so difficult and it is one of the reasons why the the question of allocation is so perplexing.
Defendants request a judicial declaration of a 50-50 split of the resources; plaintiffs point out that a 50-50 split might take a *1059 number of forms. It could constitute a lake by lake split; it could be a territorywide split; it could constitute an even split of each resource; or it could entail some sort of splitting up of the total resources, with one group taking all fish, or all deer, for example. Plaintiffs' argument against allocation or apportionment of the resources is that their paramount claim to the resources of the ceded territory and their need to harvest those resources to secure a modest standard of living entitle them to that share of the resources they are physically able to harvest, even if the result is that non-Indians are unable to harvest any of the resource at all. This, they maintain, is the fair reading of the treaty language, and the risk assumed by the United States when it entered into the treaties. If, as seemed likely in the mid-1800's, the tribes had diminished in numbers, their ability to harvest would have diminished also, and the white settlers would have had little competition for the resources. However, the non-Indians lost their gamble: the tribes have not diminished and they have shown a need for more and more of the ceded territory's resources, which requires relinquishment of more and more of those resources by the non-Indians.
Whether there is any merit to plaintiffs' argument is a question I reserve explicitly until further development of the allocation issue. It is unnecessary as well as inappropriate to decide it now. There remain many questions that need to be answered before I am prepared to hold that an allocation must be made of walleye and muskellunge or any other resource, and, if so, how that allocation would work in practice. If the parties wish, and if they agree that the resources in any given lake are too scarce to provide Indians and non-Indians will the full amount of harvest they would otherwise take, I will take up the question of allocation next. I am not prepared to answer it at this time.
Plaintiffs concede that they are far from the point at which they are physically able to harvest all of the walleye and muskellunge that can be harvested safely, or even the 50% defendants have indicated would be a fair allocation for plaintiffs. Thus, even under defendants' view of the allocation question, it is clear that non-Indians will continue to have the opportunity to harvest walleyes and muskellunge in the ceded territory, and the Department of Natural Resources will be responsible for managing a mixed fishery, accommodating both intensive and non-intensive fishing. That responsibility presents unusual and complex challenges for the department. It requires them to make the majority of the mark-and-recapture surveys that the plaintiffs need in order to use high efficiency fishing methods. Although the plaintiffs cannot be required to take less than the safe harvest level on any lake, their voluntary observation of the 20% tribal quota proposed by the department would ease the difficult task of managing the mixed fishery.
In summary, plaintiffs have the right to take the full safe harvest of walleye and muskellunge from any lake they select for fishing by high efficiency methods. Determination of that safe harvest level for any lake is to be made on the basis of a reliable population estimate obtained as provided above, to which is applied the agreed-upon exploitation rate (presently set by the Biological Issues Group at 35% for walleyes; 27% for muskellunge), and which is then discounted by an appropriate safety factor to be determined by the Biological Issues Group, or, if the group fails to reach agreement on that factor, to be provided by the Department of Natural Resources.

8. Calculation of safety factors

Plaintiffs' management plan must incorporate the methods for computing safety factors developed by the Department of Natural Resources biologists for use in NR 13, or other safety factors that are either approved for use by the Biological Issues Group or agreed to by the parties. Defendants established at trial that neither the methods proposed in plaintiffs' first plan nor the amended methods testified to by Thomas Busiahn were adequate to protect the resources. They established *1060 also that their methods would accomplish that purpose.

9. Exchange of biological information

The fact that plaintiffs may be regulating their members' exercise of their treaty rights does not make them the manager of the fisheries. That responsibility and authority remains the defendants'. They have the fiduciary obligation of managing the natural resources within the ceded territory for the benefit of current and future users. LeClair v. Swift, 76 F.Supp. 729 (E.D.Wis.1948); State v. Erickson, 101 Wis.2d 224, 303 N.W.2d 850 (Ct.App.1981). The tribes' regulation of their members does not relieve the department of this obligation or prevent it from carrying it out, although it narrows its management options to a significant degree, and imposes burdens on them beyond those it has carried out in the previous implementation of the Voigt decision.
Because defendants will continue to bear the responsibility for the management of all of the natural resources of the state, with the exception only of those matters removed from their control by the plaintiffs' enactment of a plan meeting the conditions of this order and of those matters removed from their control by stipulation of the parties, defendants must to provided access to all biological information to which plaintiffs have access or which they obtain through their exercise of their off-reservation usufructuary rights. Therefore, any plan enacted by plaintiffs must provide that they will make available to defendants all biological information obtained by plaintiffs regarding off-reservation resources, including, but not limited to the nature of the harvest, the size of the harvest, and the size and kind of individual fish harvested, and it must permit defendants to observe and monitor any walleye or muskellunge harvesting plaintiffs undertake by spearing or netting.
Additionally, plaintiffs' plan must incorporate a mechanism for giving defendants advance notice of the lakes they intend to fish by high efficient fishing methods, their intended harvest for each lake, and the dates of harvesting.

ORDER
IT IS ORDERED that defendants are enjoined from interfering in the regulation of plaintiffs' off-reservation usufructuary rights to harvest walleye and muskellunge within the ceded territory in Wisconsin, except insofar as plaintiffs have agreed to such regulation by stipulation. Regulation of plaintiffs' off-reservation usufrucuary rights to harvest walleye and muskellunge within the ceded territory is reserved to plaintiffs on the condition that they enact a management plan that provides for the regulation of their members in accordance with biologically sound principles necessary for the conservation of the species being harvested, as set out in this opinion. Plaintiffs' failure to enact a plan that conforms to this opinion, or their withdrawal from such a plan after enactment, or their failure to comply with the provisions of the plan, will subject them, or any one of them, to regulation by defendants. FURTHER, IT IS ORDERED that the stipulations entered into by the parties relating to enforcement matters, food processing, gear identification, and safety marking, and biological and other issues, filed in this case as docket numbers 911, 912, 913, and 914, are incorporated into this order. Plaintiffs' motion for summary judgment on the issue of enjoining defendants from enforcing any provision of Chapter 29, Wis.Stat., or NR 19, NR 20, or NR 21, will be addressed in subsequent proceedings, as agreed to by the parties.

APPENDIX
NR 13.13 TOTAL ALLOWABLE CATCH, TRIBAL QUOTA AND PERMITS. (1) Each represented band shall no later than March 15, 1988 for spearing in 1988, and December 1 of each other year, identify to the department those lakes to be harvested in the following year by methods for which a permit is required, and for which the bag limit is defined as TQ. Only those lakes on which a population estimate *1061 less than 2 years old is available are eligible for identification and harvest.
(2) TOTAL ALLOWABLE CATCH. (a) The department shall, within 30 days of notification, provide to the tribes the total allowable catch upon which the tribal quota is based for bass, walleye, northern pike and muskellunge for each lake identified.
(b) The total allowable catch (TAC) is the number of fish that may be removed from the spawning population of a particular species of fish in a given year. The TAC includes all sources of unnatural (caused by human activity) fish removal including but not limited to hook-and-line angling, tribal treaty harvest and man-caused pollution. The TAC shall account for but does not include natural sources of mortality. The TAC shall be set to maintain natural reproduction in naturally reproducing populations, to restore natural reproduction in populations whose spawning stocks have been unnaturally depleted, and to maximize yield and economic benefit in strictly stocked populations. The TAC may be changed annually in response to changing population levels.
(c) The department shall set the TAC by reviewing pertinent data from lakes in the ceded territory and information from other sources and determining the proportion of the spawning stock that can annually be removed consistent with the objectives stated in par. (b). This may mean a different proportion for each type of population.
(d) The department shall estimate the number of fish in the spawning stock on all lakes over 500 acres in the ceded territory for which data collections were made during the previous 2 years. The estimate will be made by standard mark-recapture methods as outlined in the department's fish management handbook. By agreement with the tribes, other standardized sampling procedures may be developed and used.
(e) For each lake over 500 acres in the ceded territory and for which spawning population size estimates were calculated as in par. (d), the department will calculate the TAC by multiplying the population size estimate by the appropriate allowable harvest proportion. The final number shall be the TAC for that lake for the impending calendar year.
(3) TRIBAL QUOTA. The TQ shall be based on a period of ice out to ice out. For the purposes of this subchapter, TQ shall consist of 20% of the TAC.
(4) PERMITS. (a) For methods or species for which the bag limit in s. NR 13.14 is specified as TQ, individual bag limits shall be established which are equivalent to the remaining TQ divided by the number of permits issued for any one day on the specified body of water.
(b) Permits may only be issued for waters for which the cumulative tribal harvest has not exceeded the TQ and for which a population estimate less than 2 years old is available.
(c) Permits are valid only for the person to whom they are issued.
(d) Permits shall be issued by the department unless otherwise provided for pursuant to s. NR 13.05(7).
(e) In lieu of permits, the department may control TQ through a system of tags in which each treaty rights participant may take only those numbers of fish for which he or she has tags. The tags shall be locked through the mouth and gill of the fish before it is brought to shore.
NR 13.14 SEASONS, BAG LIMITS, TOTAL TRIBAL QUOTA, SIZE LIMITS AND METHODS OF TAKING. (1) The following table applies to fishing by treaty rights participants for those kinds of fish and methods listed.

*1062
(Note: Regulations for all fish other than walleye and muskellunge have been deleted.)
 Open season Individual
Kind of fish Methods (both dates daily bag Maximum or
 and locality permitted inclusive) limit or TO minimum size limits
-----------------------------------------------------------------------------------------------------
(b) Walleye.
1. All waters Hook and line First Saturday 5 No size limits
 in May to March 1
2. Lakes 500 Spearing Year round TQ Maximum of 20
 acres or subject to or until TQ inches; each
 larger s. NR 13.17 is reached fisher may take
 one fish 20-24
 inches per day
3. Lakes 500 Traps, seine Year round TQ Males only during
 acres or fyke net or or until TQ spawning season.
 larger dip net is reached. Maximum of 18
 subject to inches thereafter.
 s. NR 13.16
4. Lakes 500 Setline, set First Saturday TQ No size limits
 acres or or bank pole in May to March 1
 larger subject to or until TQ is
 s. NR 13.15 reached.
(e) Muskellunge.
1. All waters Hook and line Third Saturday 1 per Minimum size limit
 in May to day
 March 1 32 inches.
2. Lakes 500 Spearing Year round TQ 40 inch maximum
 acres or subject to or until TQ size limit
 larger s. NR 13.17 is reached.
3. Lakes 500 Nets other Year round TQ 40 inch maximum
 acres or than gill nets or until TQ size limit
 larger incidental is reached.
 to fishing
 other species
4. Lakes Gill nets June 1 to 1 per 40 inch maximum
 1000 subject to March 1 day size limit
 acres or s. NR 13.18
 larger